## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NOS. 14-652-6** |
| | : | **14-652-10** |
| **ALEJANDRO SOTELO** | : | |
| **FRANCISCO GONZALEZ JOSE** | : | |

## <u>MEMORANDUM OPINION</u>

**KEARNEY, J.**                                                    **September 6, 2016**

After evaluating testimony from twenty-one witnesses and reviewing 241 exhibits admitted during an eight day trial on charges against a Mexican-based heroin trafficking and money laundering conspiracy, the jury returned a guilty verdict on most counts against co-defendants Alejandro Sotelo and Francisco Gonzales Jose. The United States presented compelling detailed testimony from a Special Agent of the Drug Enforcement Agency, a Department of Justice forensic financial investigator and several cooperating co-conspirators who pled guilty and, for most, were serving sentences for their admitted roles in this multi-million dollar conspiracy.

Sotelo and Jose now move for judgment of acquittal under Federal Rule of Criminal Procedure 29, and for a new trial under Federal Rule of Criminal Procedure 33. They argue we erred in admitting testimony from the Special Agent and co-conspirators concerning Jose's detailed ledger of heroin sales and by language in our jury instruction upon replacing a juror with an alternate during deliberations. After our renewed analysis, we properly admitted the Special Agent's and co-conspirators' testimony and our instruction upon replacing the juror is not plain error. We deny Sotelo's and Jose's motions in the accompanying Orders.

# I.     Background

On May 6, 2015, a grand jury returned a Superseding Indictment against the Mexico-based Laredo Drug Trafficking Organization ("DTO") led by fugitives Antonio Laredo and Ismael Laredo and thirty-five individuals including Sotelo and Jose alleging, among other things, they conspired from 2008 to November 2014 to import and distribute over 1,000 kilograms of heroin in Philadelphia and laundering millions of dollars in heroin proceeds.[1] The scheme briefly succeeded, in part, by concealing heroin in car batteries, car bumpers, vehicle traps, air compressors, and sealed fruit and vegetable cans. The Laredo DTO returned money to Mexico by use of concealed cash, bulk cash, Western Union and small wire transfers and hiding money in specially equipped vehicles returning to Mexico. The grand jury charged a conspiracy based on both heroin importation and distribution and then structuring the return of millions of dollars in illegal heroin proceeds through money laundering.

Sotelo, based in Chicago, performed both roles in the conspiracy at a high level: the grand jury charged him with heroin trafficking through, among other things, receiving monthly shipments of heroin from Mexico and then storing the heroin shipments in Chicago until directed by his long-time friend Antonio Laredo to deliver heroin to the Philadelphia area for distribution and with money transfers to Mexico to conceal and launder the illegal heroin sale proceeds.

Jose, based in Philadelphia, also worked both the supply and payment side of the conspiracy: the grand jury charged him as one of the Philadelphia-based heroin distributors, responsible for distributing and selling multi-kilogram quantities of heroin and with collecting and concealing hundreds of thousands of dollars intended to be secretly returned to the Laredo brothers in Mexico.

After extensive discovery, we tried Sotelo and Jose, each separately represented by experienced counsel. The eight days of evidence overwhelmingly confirmed Sotelo, a long-time friend of Antonio Laredo from their time together in Chicago, regularly distributed and transported, and directed multiple couriers to transport, multi-kilogram quantities of heroin from Chicago to the Philadelphia area. The evidence confirmed Sotelo picked up multiple payments of hundreds of thousands of dollars representing proceeds of heroin sales. Sotelo participated in and instructed the transport of heroin and the laundering of money through banking channels for the Laredo DTO. The evidence also confirmed Jose played a key middle management role for the Laredo DTO in Philadelphia. He regularly distributed multi-kilogram quantities of heroin in the Philadelphia area. Jose made multiple payments of hundreds of thousands of dollars to the Laredo DTO representing the proceeds of heroin sales in Philadelphia. He concealed these payments. The United States adduced evidence of Jose conspiring to distribute at least ninety (90) kilograms of heroin and laundering approximately six million ($6,000,000) dollars in heroin sales.

At the close of the United States' case, Jose moved for judgment of acquittal under Fed.R.Crim.P. 29 on the money laundering charge, arguing a lack of evidence to support a conviction.[2] We denied Jose's Rule 29 motion.[3] Sotelo did not move for judgment of acquittal.[4]

Following counsel's efficient presentation of evidence to avoid duplicative testimony from several co-conspirators, the jury deliberated for approximately ninety minutes before one juror fell ill and explained he could no longer focus. We asked if he believed he could return the next day, and he expressed reservation given the illness. After discussion with counsel and inquiring of the juror, and with counsel's consent, we excused the ill juror and replaced him with one of the two alternates who had sat through the trial but had joined in deliberations.

3

Several hours later, and after an eight day trial, the jury found Sotelo guilty of conspiracy to distribute and possession with intent to distribute heroin; conspiracy to import heroin; distribution of heroin; and, conspiracy to commit money laundering. [5] The jury found Jose guilty of conspiracy to distribute and possession with intent to distribute heroin; conspiracy to import heroin; two counts of possession with the intent to distribute heroin; and, conspiracy to commit money laundering.

## II.   Analysis

### A.  We deny the motions for acquittal.

Rule 29 provides "[a]fter the government closes its evidence ..., the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[6] In considering a Rule 29 motion, we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."[7] We are required to "draw all reasonable inferences in favor of the jury's verdict," and a finding of insufficiency should "be confined to cases where the prosecution's failure is clear."[8] "We do not reweigh evidence or assess witness credibility," and "we must sustain the verdict 'if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.'"[9]

Sotelo and Jose move for judgment of acquittal under Rule 29. Jose moves for acquittal on the conspiracy to commit money laundering, arguing there is no evidence to support the jury's verdict.[10] Sotelo moves for acquittal on all counts, arguing insufficient evidence to support the jury's verdict.[11]

### 1. The jury's conviction of Jose on conspiracy to commit money laundering is supported by substantial evidence.

Our criminal law provides "any person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."[12] To prove a conspiracy under §1956(h), the United States must prove "(1) that an agreement was formed between two or more persons; and (2) that the defendant knowingly became a member of the conspiracy."[13] "Direct evidence of an agreement is not necessary as each element of a criminal conspiracy 'may be proven entirely by circumstantial evidence.'"[14]

The United States charged Jose with conspiring to violate 18 U.S.C. §1956(a)(1)(B)(i)[15] requiring it show "(1) an actual or attempted financial transaction; (2) involving the proceeds of [a] specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) ... knowledge that the transaction [was] designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of [a] specified unlawful activity."[16]

Jose argues there is no evidence to support his involvement in money laundering. Jose asserts the only evidence of any "banking" transaction is one deposit slip pulled from the trash of his residence showing a cash deposit of $5,000 into his wife's account.

When viewing a motion for judgment of acquittal under Rule 29, we must "be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury."[17] Here, the evidence showed each element of conspiracy to commit money laundering.

Several co-conspirators identified Jose's role in the money laundering conspiracy. Co-conspirator Joseph Torres, admitted member of the Laredo DTO and son-in-law of Antonio

Laredo, testified to maintaining written ledgers.[18] Torres identified ledgers showing payments made by Jose in an exchange of heroin and money.[19] Torres testified to direct payment transactions with Jose as the direction of Antonio Laredo;[20] Torres picked up money from Jose as payment for heroin;[21] Torres knew Jose made one bank deposit for Antonio Laredo;[22] Torres always received money from Jose in bulk;[23] and, Torres described at least $100,000 collected from Jose and recorded in Torres' ledger.[24]

Both Torres and co-conspirator Bertin Torres Sanchez testified to a ledger they maintained tracking deliveries of money and drugs. Torres testified he knew Defendant Jose as "Franci" and identified his ledger recording transactions for Defendant Jose for a six-week period in May – July, 2013.[25] Torres testified to being present at a cash delivery with Sanchez and Defendant Jose.[26]

Co-conspirator Sanchez testified he kept track of heroin he received and distributed in a small notebook until Joseph Torres put the information into a computer spreadsheet.[27] Sanchez testified the numbers on the spreadsheet represented money and the small numbers represented kilos and the term "ninas" means kilos of heroin.[28] Sanchez testified his ledger records money and heroin Jose gave to Sanchez; Sanchez met Jose nine (9) or ten (10) times for the purpose of transferring money and heroin.[29] Sanchez described the transactions in the ledger including, for example, a May 28, 2013 transaction where Jose gave Sanchez $50,000 in payment for heroin previously given to Jose.[30] Sanchez described the record of telephone calls between him and Jose, and confirmed he gave Jose five (5) kilograms of heroin on July 4, 2013 and Jose gave him money on July 14, 2013 as reflected in Torres' and Sanchez's ledger.[31]

Co-conspirator Edwin Vidal testified he laundered money through Western Union accounts as directed by Antonio Laredo from 2012 to 2014.[32] Vidal received money directly

from Jose in amounts ranging from \$50,000 to \$180,000 beginning in 2012.[33] Antonio Laredo directed Vidal to deliver heroin to Jose. Vidal testified he gave heroin hidden inside car batteries to Jose and then received cash from Jose in exchange for heroin.[34] Vidal testified he gave heroin to Jose hidden inside an air compressor and received money from Jose.[35]

Co-conspirator Frank Christian Peralta testified he picked up money from Defendant Jose packed in a sneaker box and turned over the money to another member of the Laredo DTO.[36] Co-conspirator Leandro Rodriguez Urena authenticated an exhibit as his handwriting on a paper noting cash collected, including from Defendant Jose, for heroin.[37] Urena testified he and Vidal together picked up \$150,000 from Jose at the direction of Antonio Laredo, and the money Urena collected came from the drugs given to Jose.[38] Urena received \$100,000 and \$75,000 from Jose on another occasions.[39] Urena identified him own name in ledgers maintained by Jose.[40] Urena testified he delivered multiple kilograms of heroin to Jose four (4) or (5) times at the direction of Antonio Laredo,[41] and picked up money from Jose (6) or seven (7) times.[42]

Additional conspirators testified to Jose's participation in the Laredo DTO. For example, co-conspirator Gregorio Lantigua Reyes testified he maintained ledgers.[43] Reyes testified to his knowledge of Jose "making bundles of heroin."[44] Co-conspirator Euddy Izquierdo testified to exchanges with Jose of drugs and money at the direction of Antonio Laredo and to Jose distributing heroin for the Laredo DTO through vehicles equipped with trap compartments to conceal drugs.[45] Izquierdo identified his nickname as "Pelo" and identified himself on ledgers maintained by Torres and Sanchez.[46] Co-conspirator Frank Felix-Herrera testified to a transaction with Jose of heroin and money in connection with the Laredo DTO and testified generally to distributing heroin for the Laredo DTO.[47]

7

Jose asserts this vast amount of evidence only shows "the money launderers" collected money from him and they, not him, deposited monies into funnel accounts and transferred monies via Western Union. Jose, however, is charged with *conspiracy* to commit money laundering. The United States' witness Senior Financial Investigator Richard McClosky testified to the Laredo DTO's money laundering methods, including bulk money transfers and the use of funnel accounts.[48] Co-conspirators testified to picking up bulk cash from Jose, and Joseph Torres testified to at least one bank deposit of cash made by Jose for Antonio Laredo.

Absent Jose, there would be no laundering of these monies. Each identified witness described Jose's knowing role in gathering money to be laundered, and Joseph Torres testified a bank deposit made by Jose for Antonio Laredo. Money laundering does not require Jose to make bank transfers. Conspirators must "pursue the same criminal objective," but a conspirator "need not agree to commit or facilitate each and every party of the substantive offense."[49] As recently instructed by the Supreme Court, the United States "does not have to prove that the defendant intended to commit the underlying offense [himself] . . . instead '[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.'"[50] Accordingly, we reject Jose's argument there must be evidence he personally made a bank transaction. As a member of the conspiracy, Jose is "liable for all reasonably foreseeable criminal offenses committed by his co-conspirators during the course of, and in furtherance of the drug conspiracy."[51] This evidence provided a sufficient basis for a reasonable juror to find Jose guilty beyond a reasonable doubt of conspiracy to commit money laundering.

## 2. Sotelo waived his initial unsupported challenge of the jury's verdict.

Sotelo initially moved for a judgment of acquittal under Rule 29 from his conviction on all four counts.[52] We ordered Sotelo to file a memorandum in support of his motion,[53] and our Local Rule of Criminal Procedure requires "post-trial motions for a judgment of acquittal, new trial or an arrest of judgment pursuant to Rule 29, 33 and 34, Federal Rules of Criminal Procedure shall be supported by memoranda filed within the time provided by such rules, or such additional time as the Court shall allow."[54]

Sotelo timely filed a memorandum, but elected to argue only for a new trial under Rule 33.[55] He elected to not cite the record or offer argument supporting his motion for judgment of acquittal based on the sufficiency of the evidence. His waiver, through failure to provide us with support, mandates our denial of his cursory Rule 29 motion.[56]

Even if we were to consider ¶31 of his motion for acquittal without any support, and as detailed throughout this Memorandum, the United States adduced ample evidence supporting the jury's findings of Sotelo's guilt.  The jury heard the compelling testimony of co-conspirator (and Antonio Laredo's son) Enoc Laredo-Barrios describing Sotelo's leadership role in the United States in importing and distributing heroin sold in Philadelphia and in laundering the proceeds of heroin sales through vehicles he outfitted and sold with trap compartments and through bank accounts in his, and his wife's name, which laundered heroin proceeds.[57]

We have no basis to find the jury's verdict against Sotelo is not sufficiently based on the evidence.

### B. We deny the motions for new trial.

Sotelo and Jose move for a new trial under Rule 33 asserting two trial errors: (1) admitting hearsay testimony relating to drug ledgers; and (2) error in our jury instruction upon

replacing an ill juror with an alternate during deliberations. Sotelo also argues our admitting ledgers prepared by non-testifying co-Defendant Jose deprived him of his right under the Confrontation Clause to cross-examination. We find no basis to grant their motions.

Under Rule 33, we "may vacate any judgment and grant a new trial if the interest of justice so requires."[58] Whether to grant such a motion is within our discretion, and we may do so "only if [we] believe[] that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted."[59] Rule 33 motions for a new trial "are not favored and should be 'granted sparingly and only in exceptional cases.'"[60]

We may grant a Rule 33 motion for new trial based on trial errors where those errors "when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial."[61] Harmless errors "that do not deprive the defendant of a fair trial are not a basis for granting" a Rule 33 motion.[62] Defendants bear the burden of proving a new trial should be granted and must show "(1) that an error occurred at trial, and (2) that error had substantial influence on the verdict."[63]

### 1. Proper admission of testimony relating to drug ledgers.

Sotelo argues broadly the "record is replete with examples" of Special Agent Patrick Moynihan's inadmissible hearsay, including Moynihan's testimony "at other times" to "events about which he had no personal knowledge while avoiding words such as 'learned' or 'told.'" Sotelo elects not to cite any portion of the extensive trial record to show objectionable testimony. As Judge Vanaskie instructs, "[i]n the absence of a specific citation to the record, judicial review of such a contention is not practicable."[64] We have no basis to review Sotelo's objections, but to the extent Sotelo's objections mirror Jose's, we evaluate them below.

10

Jose asserts the United States' witness, Special Agent Moynihan, and cooperating witnesses, and co-conspirators, Gregorio Lantigua-Reyes, Euddy Izquierdo, and Joseph Torres, testimony regarding drug ledgers found in Jose's residence constitutes hearsay and are not properly authenticated (the "Jose Ledgers").[65]

### a. Authentication of the Jose Ledgers and Sanchez' tally book.

Patrick Moynihan is an agent for the Drug Enforcement Administration ("DEA"), United States Department of Justice, assigned to the Philadelphia division.[66] Agent Moynihan began his service as a DEA agent in 2002, serving in Philadelphia since May 2011.[67] In total, Agent Moynihan has twenty years of law enforcement experience.[68]

Agent Moynihan continuously investigated the Laredo DTO beginning in May 2011.[69] During his investigation, Moynihan obtained at least a dozen search warrants for premises, residences, laptops, phones and email accounts from which he developed evidence.[70] Through his testimony, Moynihan explained generally cash seizures, the operation of a "heroin mill," the workings of DEA labs, drug cartels including the Laredo DTO, and money laundering techniques.[71] Moynihan specifically described the DEA's investigation of the Laredo DTO, including the history of significant events leading to the indictment.[72]

Agent Moynihan described surveilling Jose's residence and conducting two "trash pulls."[73] A trash pull from Jose's residence uncovered a Bank of America deposit slip showing seven cash deposits in increments totaling $5,000 which Agent Moynihan believed suggested structuring activity.[74] Another trash pull from Jose's residence revealed a "grinder," plastic gloves, a receipt for a digital scale, and a shoe box the investigation previously revealed to be used to contain bulk cash with the dollar amount written on the outside of the box.[75] Agent Moynihan identified the shoe box he retrieved out of the trash at Jose's residence and testified it

11

is similar to other shoe boxes recovered in the investigation, including monetary amounts written on the outside of the box.[76]

After evidence gathered from a later trash pull, Moynihan obtained a search warrant for Jose's residence and participated in the search.[77] Moynihan testified he found a heat sealer; shrink wrap; trash bags; electrical, duct, and clear tape; a funnel; vacuum sealer; sandwich bags; and a substance believed to be a cutting agent used to dilute the heroin received from Mexico and then re-package or reconstitute heroin.[78]

Agent Moynihan testified he found a wrapped plastic bag of bulk cash in the amount of $24,000 found in a dresser drawer in the master bedroom of Jose's residence.[79] Moynihan found and seized an identification card and passport for Jose in the bedroom of his residence.[80] Along with this evidence, Moynihan found ledger notebooks on the top of the dresser in the bedroom of Jose's residence.[81]

Jose objects the ledgers found by Moynihan in the warrant authorized search of his residence are not properly authenticated under Federal Rule of Evidence 901. To satisfy the general rule of authenticating or identifying an item of evidence under Rule 901(a), "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[82] Rule 901(b) provides examples of evidence satisfying the requirements of 901(a).

Considering the overwhelming evidence of Agent Moynihan's investigation, search warrant, and seizure of items from Jose's residence, including the seizure of $24,000 cash and the ledgers from Jose's bedroom, we find his ledgers properly authenticated. Our Court of Appeals instructs for purposes of authentication under Fed.R.Evid. 901, the United States need only make a *prima facie* showing of authenticity and, once made, it is for the jury to determine

the authenticity of evidence, not the Court.[83] "The only requirement is that there has been substantial evidence from which [the jury] could infer that the document was authentic."[84] We find sufficient evidence from which the jury could find Jose authored the ledgers found in his residence.

Jose additionally objects to Moynihan's testimony to a tally book created by co-conspirator Bertin Sanchez seized in a July 2013 warrant authorized search of co-conspirators' apartment on City Line Avenue in Philadelphia. Moynihan's testimony identified names in the tally book and quantity of heroin, in kilograms, associated with each name. Moynihan identified the name "Fraci" listed in the tally book, testifying his investigation determined "Fraci" meant "Franci," a nickname for Defendant Jose as corroborated by cooperating co-conspirators Joseph Torres and Bertin Torres Sanchez. [85] Moynihan testified the numbers in the tally book, including "5" next to "Franci's" name, represented kilograms of heroin distributed by members of the Laredo DTO.[86] The United States did not offer the testimony to show the truth of heroin distribution on the identified dates but only to read and define the commonly used heroin nicknames in the tally book. The United States laid the foundation for Moynihan's testimony regarding the seizure of the tally book during the search of the City Line Avenue apartment, including the seizure of twelve 12 kilograms of heroin.[87] Although Moynihan did not execute the City Line Avenue search because he was executing a search warrant at another location, agents executing the search at City Line Avenue provided him with the evidence found at City Line Avenue to Moynihan.[88] Moynihan identified photographs taken at the City Line Avenue location during the search.[89]

Co-conspirator Bertin Torres Sanchez authored the tally book.[90] Sanchez identified the tally book as his, and testified the tally book was in the City Line Avenue apartment on the day

of his arrest.[91] Sanchez testified he gave five kilograms of heroin to Defendant Jose reflected in the tally book, and identified other individuals recorded in his tally book.[92]

Jose argues because Moynihan neither recovered the tally book nor wrote it, his testimony to its contents is without foundation. For the reasons already explained, we disagree; finding the United States properly authenticated Sanchez's tally book.

### b. The Jose Ledgers are admissible.

Having found the Jose Ledgers properly authenticated, we next address whether the Jose Ledgers are hearsay. "'Hearsay' means a statement: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offered in evidence to prove the truth of the matter asserted in the statement."[93] Jose argues Moynihan's testimony and co-conspirators' testimony as to the contents of the Jose Ledgers is hearsay.

Moynihan testified he examined Jose's ledgers, finding the ledgers contained entries of names, drug weights, and money payments relating to the Laredo DTO from 2010 through early 2014. Jose objects to Moynihan's identification of names in the Jose Ledgers; cooperating witness Joseph Torres' identification of names and terms in the Jose Ledgers; testimony regarding numbers reflecting gram weights in heroin received by Jose; and, numbers reflecting Jose's balance owed and payments made to the Laredo DTO. Moynihan testified Jose's Ledgers reflect payment to Torres and co-conspirators Urena and Vidal, and payments of hundreds of thousands of dollars and multiple kilograms of heroin distributed for the Laredo DTO.

Jose objects to Torres' testimony regarding the Jose Ledgers after Torres testified he (Torres) was unaware Jose kept records.[94] The United States showed Torres the Jose Ledgers. Torres identified the Jose Ledgers as a ledger accounting for money and drugs.[95] Torres then testified to receiving payments from heroin distributors in Philadelphia including Jose and

14

recording payments in a ledger Torres and co-conspirator Bertin Torres Sanchez maintained.[96] Torres and Sanchez testified to their own ledgers which are consistent with the Jose Ledgers. Co-conspirators Izquierdo and Urena identified their names in the Jose Ledgers. Reyes testified he recognized the names in the Jose Ledgers because he sold drugs to them, and kept ledgers similar to the Jose Ledgers.

The United States offered this testimony to describe the use of ledgers and define the vocabulary including through witnesses with extensive knowledge of the Laredo DTO and their own nicknames. This testimony describes the tools of a large scale heroin trafficking conspiracy particularly in the context of consistent testimony of the Laredos' vigilance in accounting records. No witness testified, based on the ledgers, Jose imported or distributed heroin or laundered heroin proceeds. We find this testimony is offered to show Jose kept ledgers found by Agent Moynihan in his search of Jose's residence along with other items typically used in a drug operation and go to Jose's participation in the conspiracy, and not for the truth of their contents.[97]

### c. The Jose Ledgers are properly admitted as admissions by a party opponent under Rule 801(d)(2)(A).

Even if the Jose Ledgers constitute hearsay, we find they fall within an exception to the hearsay rule under Rule 801(d)(2)(A) and admissible as an admission by a party opponent.[98] As set forth above, there is sufficient evidence to enable the jury to determine Jose authored or adopted the ledgers, including their discovery on a dresser in the bedroom of his residence at the time of the search.[99] Jose does not argue, and we have no evidence suggesting, any other person residing with Jose created the Jose Ledgers.

### d. Testimony of co-conspirators as to their own ledgers is admissible under Rule 801(d)(2)(E).

We similarly reject Jose's hearsay objections to the admission of testimony by co-conspirators Torres, Reyes, and Izquierdo. Jose argues these witnesses testified to the Jose Ledgers despite having "no firsthand knowledge."

The testimony of the co-conspirators is admissible as statements under Fed.R.Evid. 801(d)(2)(E).[100] To admit hearsay statements under 801(d)(2)(E), a district court must find by a preponderance of the evidence "(1) that a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy.'"[101]

In *Ortiz*, Judge DuBois admitted a notebook used to record the drug transactions of the organization as well as evidence of a co-conspirator recording the transactions. The entries contained "information of use to members of the drug conspiracy in keeping track of their drug deliveries and finances."[102] Judge DuBois found "the notebook entries were properly admitted as statements made in the course of and furtherance of the conspiracy under Rule 801(d)(2)(E)."[103]

We found, by a preponderance of the evidence, a conspiracy directed by the Laredos through Sotelo and manifest in middle management distributors such as Jose. The cooperating co-conspirators provided candid fulsome testimony confirming their role in the Laredo DTO and personal knowledge of Jose's extensive role. The co-conspirators prepared their ledgers and statements during their time they played a central role in the ongoing conspiracy. We properly admitted the co-conspirators' ledgers.

### e.   The Jose Ledgers are business records under Rule 803(6).

The Jose Ledgers additionally constitute business records under Fed.R.Evid. 803(6)[104] and are an exception to the hearsay rule. Before admitting evidence as a business record, the

United States "must lay a foundation with a qualified witness who will testify that: (1) the declarant in the records had knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions which were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were kept regularly by the business."[105] As set forth above, the United States laid the necessary foundation through Agent Moynihan and co-conspirators to show ledgers, including the Jose Ledgers, were maintained in the course of the Laredo DTO to account for heroin distribution and cash proceeds.[106]

### f.  Harmless error

Even if admitting testimony reading the words in the Jose Ledgers constitutes error, it is harmless. "Unless 'there is a reasonable possibility that [the error] contributed to the conviction, reversal is not required.'"[107] "An error is harmless if 'it is highly probable that the error did not contribute to the judgment.'"[108] This standard is met "when the court possesses a 'sure conviction' that the error did not prejudice the defendant."[109]

The United States presented substantial evidence from co-conspirators' exhaustive testimony describing Jose's participation in the conspiracy to distribute heroin and money laundering. We conclude even if the admission of testimony on Jose Ledgers constitutes hearsay, the error is harmless.

### 2.  Our jury instruction after we dismissed an ill juror is not plainly erroneous.

Sotelo and Jose assert we erred during our short instruction to the jury after replacing a juror, taken ill during deliberations, with an alternate juror. Solano and Jose did not object at trial to the jury instruction. Where there is no objection at trial, we review Sotelo's and Jose's claims of trial error for plain error.[110] We can correct an error not raised at trial if there is "(1) 'error,'

17

(2) that is 'plain,' and (3) that 'affect[s] substantive rights.'"[111] "Under this standard, the instruction at issue is only reversible if the error is 'particularly egregious' such that it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"[112]

Under Rule 24(c)(3), we "may retain alternate jurors after the jury retires to deliberate" and, if the alternate juror is retained, we "must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged."[113] We "must instruct the jury to begin its deliberations anew" if an alternate replaces a juror after deliberations have begun."[114]

After approximately ninety minutes of deliberation, a juror notified the Court of illness, reporting his condition rendered him incapable of continuing.[115] We reconvened with all counsel, outside the presence of the jury, to discuss the issue on the record.[116] We reminded counsel of the two alternate jurors kept in a separate location.[117] At the request of counsel, and on the record, we questioned the juror regarding his condition.[118] We excused the juror without objection from counsel.[119] After replacing the ill juror with an alternate, we instructed the jury:

> Ladies and gentlemen, I -- I appreciate your extraordinary efforts. As you may know, we have replaced one -- Juror Number 10 with an alternate and I appreciate the alternate's service.
>
> Under the law the selection of a foreperson remains. I don't need to know that. The selection of a foreperson remains, but with a new alternate *that person has to be brought up to speed on any decisions, determinations and you have to, sort of -- so I don't want to know this*.
>
> But by way of example if you had a sheet of paper and you went through Questions 1 and 2 or 1(A) or whatever you did, you'd have to ask that person their view just like -- just like they were in the room. So you have to start over at one and say -- I don't know the person's name -- I don't know the person's name, let's say it's Bill or Sue -- Sue, you know, what do you think about -- what do you think about one? What do you think about two? You know that kind of thing you have review. And then if your minds change because of what Bill or Sue says then you have to revisit the issue. And if you've taken a vote -- this is the most important -- if you've taken a vote on any issue already

that has resulted in a number -- that resulted in something on the piece of paper then you have to revote that number. Okay.[120]

Neither Sotelo nor Jose objected to this instruction at the time given, but now assert the portion of the Court's instruction  - "that person has to be brought up to speed on any decisions, determinations" - did not properly instruct the jury it must begin deliberations anew as required by Rule 24(c)(3).[121]

Although he did not object to the replacement of the ill juror, Sotelo now argues the instruction "could have affected the deliberative process or frustrated [his] right to a trial by jury . . ." citing the 1983 Advisory Committee notes to Fed.R.Crim.P. 23(b), and two decisions from the Ninth and Eleventh Circuit Court of Appeals. Amended in 1983, Rule 23(b)(3) allows district courts discretion to proceed with eleven jurors after excusing a juror for good cause, even without a stipulation by the parties. The Advisory Committee explained the purpose of the 1983 amendment is to provide a district court with an "available course of action other than mistrial" when "a juror is lost during deliberations."[122] As a procedural objection, Sotelo cites the Advisory Committee's comment suggesting a district court should continue with eleven jurors rather than substituting an alternate because "[e]ven were it required that the jury 'review' with the new juror their prior deliberations or that the jury upon substitution start deliberations anew, it still seems likely that the continuing jurors would be influenced by the earlier deliberations and that the new juror would be somewhat intimidated by the others by virtue of being a newcomer to the deliberations."[123] We reject this argument. As the Court of Appeals for the Ninth Circuit recently explained to distinguish the Advisory Committee's 1983 comments, "[n]otwithstanding these concerns, Rule 24(c) was amended in 1999 to give district courts discretion to retain alternates after deliberations have begun."[124] Thus, Rules 23 and 24 "provide courts three options after excusing a juror for good cause during deliberations: (1) declare a mistrial; (2) proceed with

11 jurors; or (3) seat an alternate."[125] This is consistent with the Advisory Committee's comments to the 1999 Amendments to Rule 24:

> Rule 23(b) provides that in some circumstances a verdict may be returned by eleven jurors. In addition, there may be cases where it is better to retain the alternates when the jury retires, insulate them from the deliberation process. And have them available should one or more vacancies occur in the jury. That might be especially appropriate in a long, costly, and complicated case. ***To that end the Committee believed that the court should have the discretion to decide whether*** to retain or discharge the alternates at the time the jury retires to deliberate and to use Rule 23(b) to proceed with eleven jurors ***or to substitute a juror or jurors with alternate jurors who have not been discharged***.[126]

Consistent with Rule 24, we excused the ill juror without objection, sat an alternate juror, and instructed the jury under Rule 24(c)(3). Sotelo also consented to the alternate. He has no basis to challenge our seating of an alternate after his consent. He never mentioned proceeding with eleven jurors.

Turning our attention to the substance of the charge, we evaluate alleged errors by considering "'the totality of the instructions and not a particular sentence or paragraph in isolation.'"[127] We review "'the charge itself as part of the whole trial' since 'isolated statement . . . seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial.'"[128] Considering the instruction as a whole, it is not plainly erroneous. Our instruction to the jury is the functional equivalent of an instruction to begin its deliberations anew.[129] We instructed the reconstituted jury to consider every issue, and ask the new juror his/her view "just like they were in the room" during the earlier deliberations. We instructed the jury "to start over" and, as an example, if the jury went through questions one and two, ask the new juror: "'What do you think about one?' 'What do you think about two?' You know that kind of thing you have review. And if your minds change because of what [new juror] says, then you

have to revisit the issue." We instructed the jury: "And if you've taken a vote - this is the most important - if you've taken a vote on any issue already that has resulted in a number - that resulted in something on the piece of paper then you have to revote that number."

Our instruction complied with Rule 24(c)(3). As our Court of Appeals found in *Claudio*, "[t]he words 'begin anew' carry no talismanic power, and we would exalt form over substance were we to ignore the salutary effect of the trial court's instructions in this case."[130] There is no plain error, and Sotelo's and Jose's motion for a new trial based on this objection is denied.

### 3. There is no violation of the Confrontation Clause.

Relying on *Bruton v. United States*,[131] Sotelo argues we deprived his right under the Confrontation Clause to cross-examine Jose entitles him to a new trial. Sotelo asserts Jose, a non-testifying co-defendant, could not be examined on the contents of the Jose Ledgers.

Our Court of Appeals[132] recently explained the contours of the Sixth Amendment's Confrontation Clause established in three Supreme Court cases: *Bruton*; *Richardson v. Marsh*[133]; and *Gray v. Maryland*.[134] Taking these cases together, "the current state of the law is that there is a Confrontation Clause violation when a non-testifying codefendant's confession is introduced that names another codefendant, . . . or that refers directly to the existence of the codefendant in a manner that is directly accusatory" because "such statements present a 'substantial risk that the jury, despite instructions to the contrary, [will] look[] to the incriminating extrajudicial statements in determining [the defendant's] guilt.' "[135]

Sotelo concedes the protections of the Confrontation Clause and *Bruton* apply only to testimonial statements, but argues the Jose Ledgers should be considered "testimonial" because Jose, as the author of the ledgers, knew or should have known the ledgers, if discovered, would be used in a criminal prosecution. Sotelo cites *Davis v. Washington*[136] to contend the Jose

21

Ledgers are "testimonial." In *Davis*, the Supreme Court addressed whether statements made in the course of police interrogation are testimonial, and distinguished between statements made to police "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" and statements made to police when "circumstances objectively indicate that there is no such ongoing emergency, and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."[137]

Our Court of Appeals instructs the Confrontation Clause inquiry is twofold: first we determine whether the contested statement – here the Jose Ledgers – qualifies as "testimonial" under *Davis* and its progeny;[138] second, we apply "the appropriate safeguard: 'If the absent witness's statement is testimonial, then the Confrontation Clause requires 'unavailability and a prior opportunity for cross-examination.'"[139] If statements are not testimonial, we "review the admissibility of the hearsay evidence under the Federal Rules of Evidence."[140]

We conclude the Jose Ledgers are not "testimonial" as defined by Supreme Court precedent. The Jose Ledgers "bear none of the characteristics exhibited by testimonial statements."[141] There is no evidence Jose intended the primary purpose of his ledgers to aid investigation or prosecution; to the contrary, the evidence showed Jose kept the ledgers in the bedroom of his residence to record ongoing debits and credits. There is no evidence Jose knew his ledgers would be discovered or intended to incriminate his co-conspirators when creating his ledgers. To the contrary, his co-conspirators described the need for ledgers to account for their activities to the Laredos. Jose, and his co-conspirators, more likely created the ledgers to ensure the palest ink is more reliable than the most powerful memory. We have no basis Jose, or any co-

22

conspirator, created ledgers to aid investigation or prosecution.  We did not deprive Sotelo of his right to confront a witness.

## III.   Conclusion

The jury's considered verdict after eight days of trial reassures us of the value of the fact-finding adversarial process based on careful investigation by experienced professionals presented by experienced prosecutors. Talented defense lawyers protect accused persons but cannot create or change the facts.  There is no basis to vacate the jury's verdict based on witnesses' informed description of terms of art and nicknames in a defendant's drug ledger found in his residence particularly given substantial direct evidence from his co-conspirators against him. Sotelo and Jose played central roles, albeit at different stages, in the conspiracy to import and distribute vast quantities of heroin and launder the millions of dollars in drug proceeds to the Laredo brothers in Mexico.  Having provided Sotelo and Jose the fullest level of due process and fairness during the trial, we uphold the jury's verdict and deny the Defendants' post-trial motions in the accompanying Orders.

---

[1] ECF Doc. No. 23.

[2]  N.T. April 22, 2016 at 213-14 (ECF Doc. No. 850).

[3] *Id.* at 215-16. In denying Jose's Rule 29 motion, we found the United States offered evidence regarding transactions involving money concealed in trash bags and shoe boxes and direct communications with the Laredos in Mexico regarding the transfer of money.

[4] *Id.* at 214.

[5] The jury acquitted Sotelo of distributing one kilogram or more of heroin on one date charged in Count 20.

[6] Fed. R. Crim. P. 29(a), (c)(1).

[7] *U.S. v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *U.S. v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)); *see also U.S. v. Salahuddin*, 765 F.3d 329, 348 (3d Cir. 2014).

[8] *Smith* at 476-477 (quoting *U.S. v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) and *U.S. v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

[9] *U.S. v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007) (quoting *U.S. v. Coyle*, 63 F.3d 1239, 1243 (3d Cir.1995)).

[10] ECF Doc. Nos. 620, 855.

[11] ECF Doc. No. 628.

[12] 18 U.S.C. §1956(h).

[13] *U.S. v. Greenidge*, 495 F.3d 85, 100 (3d Cir. 2007) (citing 18 U.S.C. § 1956(h)).

[14] *U.S. v. Davis*, 373 F.App'x 239, 242 (3d Cir. 2010) (quoting *U.S. v. Applewhaite*, 195 F.3d 679, 684 (3d Cir. 1999)).

[15] Section 1956(a)(1)(B)(i) provides:

> "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity   . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment . . . or both."

[16] *U.S. v. Richardson*, 658 F.3d 333, 337–38 (3d Cir. 2011) (quoting *U.S. v. Omoruyi*, 260 F.3d 291, 294-95 (3d Cir.2001)); *U.S. v. Podlucky*, 567 F.App'x 139, 145 n. 13 (3d Cir. 2014) (citing *Omoruyi*, 260 F.3d at 294-95).

[17] *U.S. v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).

[18] N.T. April 19, 2016 at 40-46 (ECF Doc. No. 847).

[19] *Id.* at 45-46, 55, 65-68.

[20] *Id.* at 68-69.

[21] *Id.* 119-120; 137-138.

[22] *Id.* at 120.

[23] *Id.* at 121.

[24] N.T. April 18, 2016 at 272 (ECF Doc. No. 846).

[25] N.T. April 19, 2016  at 44-45 (ECF Doc. No. 847).

[26] *Id.* at 44-46.

[27] N.T. April 20, 2016 at 137-143 (ECF Doc. No. 848).

[28] *Id.* at 138-139.

[29] *Id.* at 141-142. Sanchez identified "Franci" as Defendant Jose. *Id.* at 143.

[30] *Id.* at 147-150.

[31] *Id.* at 166-167.

[32] *Id.* at 234-236, 238.

[33] *Id.* at 236-244.

[34] *Id.* at 245-255.

[35] *Id.* at 259-264.

[36] N.T. April 21, 2016 at 19-25 (ECF Doc. No. 851).

[37] *Id.* at 74-75.

[38] *Id.* at 74-76.

[39] *Id.* at 81-84.

[40] *Id.* at 84-85.

[41] *Id.* at 86-87.

[42] *Id.* at 99-101.

[43] N.T. April 21, 2016 at 30 (ECF Doc. No. 849).

[44] *Id.* at 40-41.

[45] N.T. April 21, 2016 at 140-146 (ECF Doc. No. 851).

[46] *Id.* at 148-149.

[47] N.T. April 21, 2016 at 105-109; 110-114 (ECF Doc. No. 851).

[48] N.T. April 22, 2016 at 128-134 (ECF Doc. No. 850).

[49] *Ocasio v. U.S.*, 136 S.Ct. 1423, 1429, 194 L.Ed.2d 520 (2016) (quoting *Salinas v. U.S.*, 522 U.S. 52, 63 (1997)).

[50] *Id.* at 1429-30 (internal citations omitted).

[51] *U.S. v. Walker*, 392 F.App'x 919, 923 (3d Cir. 2010) (citing *Pinkerton v. U.S.*, 328 U.S. 640 (1946)); *U.S. v. Norris*, 719 F.Supp.2d 557, 566 (E.D. Pa. 2010) (citing *Pinkerton,* 328 U.S. at 647-48).

[52] ECF Doc. No. 628.

[53] ECF Doc. No. 794.

[54] E.D. Pa.L.Crim.P. R. 47.1.

[55] *See* ECF Doc. No. 841.

[56] *See U.S. v. Morris*, No. 05-440, 2010 WL 3505131, at *1 (E.D.Pa. Sept. 2, 2010) (collecting cases); *U.S. v. Vitillo*, No. 03-555, 2005 WL 1006287, *3 (E.D.Pa. Apr. 29, 2005) (collecting cases). Unlike Judge Surrick's willingness to evaluate arguments absent record cites in *Morris* and *Vitillo*, we are left with no argument at all. We would proceed with evaluating arguments without record cites (as we do today for the United States' arguments without record cites), but cannot proceed after Sotelo elected to not present argument at all. Sotelo's timely motion for acquittal (ECF Doc. No. 628, ¶ 31) only advises "the evidence… was insufficient as a matter of law to sustain a conviction because the record contains no evidence, regardless of how it is weighted, from the jury could find guilt beyond reasonable doubt." Sotelo must recognize we cannot find insufficiency of evidence without argument.

[57] N.T. April 22, 2016 at 74-80 (ECF Doc. No. 850); Senior Financial Investigator McCloskey also specifically described Sotelo's significant role in laundering heroin proceeds through a Bank of America account. *Id.* at 143-149.

[58] Fed.R.Crim.P. 33(a).

[59] *U.S. v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006) (citing *Gov't of Virgin Islands v. Lima*, 775 F.2d 1245, 1250 (3d Cir. 1985)) and *U.S. v. Staten*, 557 F.App'x 119, 121-122 (quoting *U.S. v. Silveus*, 542 F.3d 993, 1005-05 (3d Cir. 2008)).

[60] *U.S. v. Silveus*, 542 F.3d 993, 1117 (3d Cir. 2008) (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

[61] *U.S. v. MacInnes*, 23 F.Supp.3d 536, 541 (E.D. Pa. 2014) (quoting *U.S. v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)); *U.S. v. Norris*, 753 F.Supp.2d 492, 517 (E.D.Pa. 2010) (quoting *U.S. v. Malik*, No. 08–614, 2009 WL 4641706, at *3 (E.D.Pa. Dec. 7, 2009)).

[62] *U.S. v. Kolodesh*, No. 11-464, 2014 WL 1876214, *3 (E.D. Pa. May 12, 2014) (citing *Thornton*, 1 F.3d at 156).

[63] *MacInnes,* 23 F.Supp.3d at 541 (quoting *U.S. v. Amimazmi*, 648 F.Supp.2d 718, 720 (E.D. Pa. 2009), *aff'd*, 645 F.3d 564 (3d Cir. 2011)).

[64] *U.S. v. Polishan*, No. 96-274, 2001 WL 848583, at *14 n.7 (M.D. Pa. July 27, 2001) (collecting cases); *see also U.S. v. Vitillo*, 2005 WL 1006287, at *3.

[65] United States' Exhibits 200-203 collectively referred to as "Jose Ledgers."

[66] N.T. April 14, 2016 at 5-6 (ECF Doc. No. 844).

[67] *Id.*

[68] *Id.* at 6.

[69] *Id.* at 32.

[70] *Id.* at 17-18.

[71] *Id.* at 18-30.

[72] *Id.* at 31-112.

[73] *Id.* at 194-197. Agent Moynihan explained a "trash pull" is an investigative technique whereby agents go through a subject's trash set out at the curbside. *Id.* at 13.

[74] *Id.* at 199-202.

[75] *Id.* at 202-208.

[76] *Id.* at 207-208.

[77] *Id.* at 208-209.

[78] *Id.* at 209-212.

[79] *Id.* at 215-216.

[80] *Id.* at 216-218.

[81] *Id.* at 218-219.

[82] Fed.R.Evid. 901(a).

[83] *U.S. v. McGlory*, 968 F.2d 309, 328-29 (3d Cir. 1992); *see also U.S. v. Browne*, 2016 WL 4473226, at *6 (3d Cir. Aug.25, 2016) (discussing *McGlory* in reaching its holding social media posts properly authenticated).

[84] *McGlory*, at 329 (quoting *Link v. Mercedes-Benz of North America*, 788 F.2d 918, 928 (3d Cir. 1986)).

[85] N.T. April 14, 2016 at 115-116 (ECF Doc. No. 844).

[86] *Id.* at 117-120.

[87] *Id.* at 108-109.

[88] *Id.* at 110.

[89] *Id.* at 110-112.

[90] N.T. April 20, 2016 at 157 (ECF Doc. No. 848).

[91] *Id.* at 157-158.

[92] *Id.* at 160.

[93] Fed.R.Evid. 801(c).

[94] N.T. April 19, 2016 at 112 (ECF Doc. No. 847).

[95] *Id.* at 125-126.

[96] *Id.* at 127.

[97] *McGlory*, 968 F.2d at 332-33; *see also U.S. v. Gonzales*, 307 F.3d 906, 909 (9th Cir. 2002) (testimony of DEA agent regarding "pay/owe sheets" used to keep track of drug sales offered not to prove the truth of their contents but as "tools of the trade" commonly used by drug distributors and not hearsay).

[98] Fed.R.Evid. 801(d)(2)(A) provides:

"A statement that meets the following conditions is not hearsay:

>    (2) An Opposing Party's Statement. The statement is offered against an opposing party and:
>    . . .
>    (A) was made by the party in an individual or representative capacity."

[99] *Browne*, 2016 WL 4473226, at *9 (citing *McGlory*, 968 F.2d at 334 & n. 17.

[100] Fed.R.Evid. 801(d)(2)(E) provides:

"A statement that meets the following conditions is not hearsay:

>    (2) An Opposing Party's Statement. The statement is offered against an opposing party and:
>    . . .
>    (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

[101] *McGlory,* 968 F.2d at 333(citing *Bourjaily v. U.S.*, 483 U.S. 171, 175 (1987)); *see also U.S. v. Ortiz*, 182 F.Supp. 2d 443, 449 (E.D.Pa. 2000) (quoting *McGlory,* 968 F.2d at 333); *U.S. v. Gil*, 58 F.3d 1414, 1419-1421 (9th Cir. 1995).

[102] *Ortiz,* at 450.

[103] *Id.*; *see also McGlory,* 968 F.2d at 338 (describing records of drug business as "documents prepared in furtherance of conspiracy"); *U.S. v. Young,* 39 F.3d 1561, 1571 (11th Cir. 1994) (finding spiral notebooks containing records of drug transactions admissible under Fed. R. Evid. 801(d)(2)(E)); *U.S. v. Arce,* 997 F.2d 1123, 1128 (5th Cir. 1993) (concluding a co-conspirator's drug ledgers were admissible under Fed. R. Evid. 801(d)(2)(E)).

[104] Business records are not excluded by the hearsay rule if properly admitted under Rule 803(6) providing:

>    A record of an act, event, condition, opinion, or diagnosis if:
>
>    (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a

statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

[105] *U.S. v. Onyenso*, 615 F.App'x 734, 737 (3d Cir. 2015) (citing *U.S. v. Furst*, 886 F.2d 558, 571 (3d Cir. 1989)).

[106] *See e.g. Ortiz*, 182 F.Supp. 2d at 451-52.

[107] *Ortiz*, 182 F.Supp.2d at 453 (quoting *Gov't of Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir. 1982)).

[108] *U.S. v. Saada*, 212 F.3d 210, 222 (3d Cir. 2000) (quoting *U.S. v. Gibbs*, 190 F.3d 188, 213 n. 16 (3d Cir.1999)).

[109] *Id.*; *see also Ortiz*, 182 F.Supp.2d at 453 (quoting *Saada*, 212 F.3d at 222); *U.S. v. Terlingo*, No. 99-525, 2001 WL 474407, at *12 (E.D.Pa. Apr. 30, 2001) (quoting *Saada,* 212 F.3d at 222).

[110] *U.S. v. Carr*, No. 15-455, 2016 WL 4087248, at *8 (E.D.Pa.,Aug. 1, 2016) (citing *U.S. v. Hakim*, 344 F.3d 324, 333 (3d Cir. 2003)); *U.S. v. Norris*, 753 F.Supp.2d at 517-18.

[111] *Carr*, at *8 (quoting *Johnson v. U.S.,* 520 U.S. 461, 467 (1997)); *see also Salahuddin*, 765 F.3d at 337.

[112] *Norris*, 753 F.Supp. 2d at 518.

[113] Fed.R.Crim.P. 24(c)(3).

[114] *Id.*

[115] April 22, 2016 ESR transcript at 49 (ECF Doc. No. 732).

[116] *Id.* at 49-53.

[117] *Id.* at 49-50, 52, 56.

[118] *Id.* at 53-56.

[119] *Id.* at 57-59, 65-66.

[120] April 22, 2016 ESR transcript at 66-67 (ECF Doc. No. 732) (emphasis added).

[121] Jose's motion for new trial does not object to the Court's replacement of the ill juror with an alternate juror; he objects only to the instruction as plain error under Rule 24(c)(3).

[122] *See* Rule 23 Advisory Committee notes to 1983 Amendment.

[123] *Id.*

[124] *U.S. v. Brown*, 784 F.3d 1301, 1304 (9th Cir. 2015).

[125] *Id.*

[126] *See* Rule 24 Advisory Committee comments to 1999 Amendments (emphasis added).

[127] *Norris*, 753 F.Supp.2d at 518 (E.D.Pa. 2010) (quoting *U.S. v. Khorozian*, 333 F.3d 498, 508 (3d Cir.2003)).

[128] *Id.* (quoting *U.S. v. Park*, 421 U.S. 658, 674–75 (1975)).

[129] *Claudio v. Snyder*, 68 F.3d 1573, 1577 (3d Cir. 1995).

[130] *Claudio*, 68 F.3d at 1577; *see also U.S. v. Ross*, 323 F.App'x 773, 775 (11th Cir. 2009) (trial court's instruction to jury when alternate juror replaced a sick juror after deliberations began adequately explained procedure despite its failure to use the exact word "anew").

[131] 391 U.S. 123(1986).

[132] *Washington v. Sec'y of Pa. Dept. of Corrections*, 801 F.3d 160, 165 (3d Cir. 2015).

[133] 481 U.S. 200 (1987).

[134] 523 U.S. 185 (1998).

[135] *Washington*, 801 F.3d at 166 (citing *Bruton*, 391 U.S. at 126 and *Gray*, 523 U.S. at 193-94).

[136] 547 U.S. 813 (2006).

[137] *Id.* at 822.

[138] *U.S. v. Moreno*, 809 F.3d 766, 773-74 (3d Cir. 2016) (quoting *U.S. v Berrios*, 676 F.3d 118, 127 (3d Cir. 2012) (footnote omitted)).

[139] *Id.* at 774 (quoting *Berrios* at 127).

[140] *U.S. v. Merritt*, No. 07-550, 2013 WL 124947, at *2-*3 (E.D. Pa. Jan. 8, 2013).

[141] *Berrios*, 676 F.3d at 128.